

# NUMBER 13-18-00602-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**JAVIER SOBREVILLA,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

### On appeal from the 430th District Court
### of Hidalgo County, Texas.

---

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Longoria
Memorandum Opinion by Justice Longoria**

Appellant Javier Sobrevilla pleaded guilty to murder, a first-degree felony. *See* TEX. PENAL CODE ANN. § 19.02. The trial court sentenced him to thirty years' imprisonment. By one issue on appeal, Sobrevilla argues that the trial court erred by denying his sudden passion defense at the punishment phase. We affirm.

# I. BACKGROUND

In January 2017, Sobrevilla was indicted for murder. *See id.* The indictment alleged that on November 21, 2016, Sobrevilla caused the death of his wife, Maria Sobrevilla, by shooting her with a firearm. Sobrevilla was taken into custody on November 26, 2016 upon returning to the United States from Mexico. While in custody, Sobrevilla offered two statements. In his first custodial statement, which was written in Spanish, Sobrevilla disclaimed any knowledge or involvement with his wife's death. Sobrevilla asserted that he only learned of her death afterwards by a phone call from his brother. However, in his second custodial statement, which was also originally written in Spanish, Sobrevilla admitted to killing his wife:

> I would like to say that I have given investigators of the Sheriff's Office a statement about the death of my wife, Maria Guadalupe Sobrevilla. I want to add some information that [I] didn't give them.
>
> I want to say that when [I] talked to my wife on the phone on that Monday in the morning and heard Eddie Cantu,[1] in the background, saying what he said, I got angry and I wanted to kill him. I got dressed and got my .40 caliber Smith and Wesson weapon which was registered in the name of my wife and I loaded it with nearly 8 to 10 bullets. I got in my car and instead of going to Reynosa, Mexico, like I'd planned to do, I went to her house.
>
> I knew where she lived because about three weeks ago[,] I was in the area of Monte Cristo and Closner in the Junior's store in Edinburg, Texas, and saw her vehicle. I ended up following her to her house and found out where she lived.
>
> Before getting to her trailer I stopped at the light on Monte Cristo and Conway and loaded it with a bullet getting the gun ready to shoot. When I got to her house[,] I saw that there was a white car that was parked on her property and I thought it was Eddie's car. I saw Maria coming out of the trailer, I don't remember what she was wearing but know that she was wearing some blue jeans. She approached the driver's side of my car and she started talking to me because I asked her where was Eddie. Maria told me that he had left because [he] thought that I was coming over. Maria saw that I had the gun on the passenger's seat of the car. Then Maria asked me

---

[1] At the time of her death, Maria was in a romantic relationship with Eddie Cantu.

if I was going to kill her. I grabbed the weapon and I pointed it at her to try and scare her and I asked her if she was scared. Maria tried to grab the gun and the gun fired twice. The gun didn't have a safety, but I don't know how it fired the second time. I have fired several weapons before, so I don't understand how the second bullet got out. I saw Maria falling to the floor and I heard her saying, "May God forgive you," and I left the property thinking that she was just wounded. I didn't see anybody outside when I left.

I went back to my house on Glasscock and picked up my medicines. I hid the weapon next to the second door inside my house against a wall and it slid all the way to the floor in the corner. I left the weapon there. After that, I locked the house and I went to Reynosa through the bridge in Pharr.

. . .

On Wednesday, November 23 of 2016, I received a call from an individual who had been doing some work around my house by the name of Juan De Leon. He told me that the doors to the little shed that is in the back of my house were open, but everything was there. I told him that it had to be the police that searched my house. Juan De Leon told me that he had found a .40 caliber gun in the alley and that he had been detained by the police which took the weapon and let him go.

I didn't go with the intention of killing my wife. I went to kill Eddie Cantu, can't lie about that. [W]as only going to scare my wife with the weapon.

I give this statement on my own free will, nothing has been promised to me in exchange for it, and I have not been coerced to give this statement.

Even though Sobrevilla originally requested a jury trial, he announced before trial began that he was going to enter a guilty plea to the offense of murder. He then requested a bench trial on punishment only. The punishment hearing began on September 10, 2019.

At the hearing, various family members, including Sobrevilla's siblings and daughter, testified concerning Sobrevilla's childhood and the kind of relationship he had with Maria. Sobrevilla testified that he was aware of Maria's affair with Cantu. Then, for the first time, Sobrevilla asserted that he killed his wife in response to verbal provocation on her part that sent him into a fit of passion. According to Sobrevilla, when Maria approached his vehicle on the day she died, she exclaimed, "No, you're an idiot. . . . No,

3

you're not worth dick. I'm not going to go with you. He makes love to me what I want [sic]. You're like this and he's like this." Sobrevilla sought permission to show the trial court the hand gestures Maria made while making this statement. According to Sobrevilla, Maria was using her hands to describe Cantu and her pinky finger to describe Sobrevilla, which Sobrevilla understood to be describing "[Cantu's] penis compared to my penis." Additionally, Maria was allegedly making facial gestures to humiliate him. Sobrevilla claimed that all of this made him so furious that his vision went blurry and he grabbed his gun. Sobrevilla testified: "I kept telling her to shut up, to shut up and she repeated the same thing and that's when I don't know how many times I fired."

Based on this testimony, Sobrevilla argued that he committed the offense under the influence of sudden passion, and that his offense should accordingly be reduced to a second-degree felony. *See id.* § 19.02(d) ("At the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree."). The trial court rejected Sobrevilla's sudden passion claim and assessed punishment at thirty years' imprisonment in the Texas Department of Criminal Justice—Institutional Division. This appeal followed.

## II. Sudden Passion

In his sole issue, Sobrevilla argues that the trial court erred by rejecting his sudden passion claim.

### A. Standard of Review & Applicable Law

4

"We review the sufficiency of the evidence establishing the elements of a criminal offense for which the State has the burden of proof under the single sufficiency standard set out in *Jackson v. Virginia.*" *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). However, an adverse finding on a defendant's affirmative defense is reviewed for both factual and legal sufficiency. *See Matlock*, 392 S.W.3d at 668–72; *Gaona v. State*, 498 S.W.3d 706, 710 (Tex. App.—Dallas 2016, pet. ref'd) (holding that the rejection of a defendant's sudden passion claim is reviewed for both factual and legal sufficiency because the defendant has the burden of proof by a preponderance of the evidence).

> When an appellant asserts that there is no evidence to support an adverse finding on which she had the burden of proof, we construe the issue as an assertion that the contrary was established as a matter of law. We first search the record for evidence favorable to the finding, disregarding all contrary evidence *unless a reasonable factfinder could not.* If we find no evidence supporting the finding, we then determine whether the contrary was established as a matter of law.

*Matlock*, 392 S.W.3d at 669 (emphasis in original). Thus, a finding of legal insufficiency in this context is only proper if the appellant establishes that the evidence conclusively proves his affirmative defense by a preponderance of the evidence and "that no reasonable jury was free to think otherwise." *Id.* at 770 (quoting *Tanner v. Nationwide Mut. Fire Ins. Co.,* 289 S.W.3d 828, 830 (Tex. 2009)).

In a factual-sufficiency review of a rejected affirmative defense, we review the entirety of the evidence in a neutral light. *Id.* at 771. We may not usurp the role of the fact-finder by "substituting [our] judgment in place of the [fact-finder's] assessment of the weight and credibility of the witnesses' testimony." *Id.* We will grant the appellant's factual-sufficiency challenge only if rejection of the appellant's affirmative defense is so contrary

5

to the great weight and preponderance of the evidence as to be manifestly unjust. *See id.*

During the punishment phase, a defendant may raise the issue of whether he caused the death under the influence of sudden passion arising from adequate cause. *See* TEX. PENAL CODE ANN. § 19.02(d). "Sudden passion" is defined as "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). "Adequate cause" is defined as a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1).

## B. Analysis

Examining the record, we conclude Sobrevilla did not conclusively establish his sudden passion claim by a preponderance of the evidence. The only evidence of provocation came from the testimony of Sobrevilla, which the court, as the trier of fact, was entitled to disbelieve. *See Matlock*, 392 S.W.3d at 669. Thus, the trial court could have determined that Sobrevilla failed to prove an adequate cause for his sudden passion defense. *See* TEX. PENAL CODE ANN. § 19.02(a)(1); *Gaona*, 498 S.W.3d at 711 ("While it is undisputed that Benavides yelled at, argued with, cursed at, and demanded to fight appellant, those actions do not amount to an adequate cause to support a finding of sudden passion.").

Additionally, Sobrevilla initiated the confrontation by driving, uninvited, to the home where his wife was staying, and seeking out Maria. And Sobrevilla only knew where she lived because he had followed her car to her home. Because there is some evidence that

6

Sobrevilla precipitated the confrontation, the evidence is legally sufficient to support the trial court's rejection of Sobrevilla's sudden passion claim. *See Smith v. State*, 355 S.W.3d 138, 149 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) ("A defendant may not rely on a cause of his own making, such as precipitating a confrontation, to support his argument that he acted out of sudden passion arising from adequate cause.").

The evidence is also factually sufficient to support the trial court's rejection of his sudden passion claim. Before traveling to find Maria, Sobrevilla had homicidal intentions. He claims that his murderous intent was directed at Cantu, yet Sobrevilla did not leave the residence upon learning that Cantu was not present. Instead, he remained to converse with his wife. After shooting his wife, Sobrevilla claims that he thought she was just injured, and yet he did not call for assistance to aid her. Instead, Sobrevilla immediately left the scene and hid the weapon. A border entry point record indicates that the vehicle belonging to Sobrevilla left the country within an hour of Maria being shot.

Additionally, Sobrevilla's testimony at the punishment hearing contradicted his custodial statement in several regards. First, according to his testimony, he shot Maria while he was blinded by fury after she humiliated him. However, according to this custodial statement, instead of shooting Maria in a spontaneous bout of rage, the gun misfired two bullets at Maria as she attempted to gain control of the gun. The fact that Maria was shot once from the front and once from behind suggests that at least one of the shots was intentional and not merely a misfire. Also, according to his custodial statement, when he drove to where Maria was staying, he thought Cantu was present because he saw a white car. However, during his testimony, he admitted that Cantu drove a truck and that he realized the truck was not at the property when he arrived.

7

Furthermore, Sobrevilla cannot claim he was suddenly shocked with the revelation of his wife's infidelity. At least four months prior to the shooting, Sobrevilla showed his sister a video of Maria engaged in sexual activity with another man.

After considering the above evidence, we conclude that the judgment is not so against the great weight and preponderance of the evidence so as to be manifestly unjust. *See Matlock*, 392 S.W.3d at 671. We hold that the evidence is factually sufficient to support the trial court's rejection of Sobrevilla's sudden passion claim.

We overrule Sobrevilla's sole issue.

### III. CONCLUSION

We affirm the trial court's judgment.

NORA L. LONGORIA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
20th day of August, 2020.

8